## UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH CAROLINA

## GREENVILLE DIVISION

| | |
|---|---|
| MICHELE BECERRA, individually and on behalf of all others similarly situated,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>PRISMA HEALTH,<br><br>　　　Defendant. | Case No.<br><br>**COMPLAINT – CLASS ACTION** |

## INTRODUCTION

1.　　This case is about an employer that saddled its employees with poor investment options when lower-cost, better-performing alternatives were available. The employer, Prisma Health, failed to uphold its fiduciary duties of loyalty and prudence under the Employee Retirement Income Security Act of 1975 ("ERISA"). Prisma Health's imprudence and disloyalty permeated its choice of investment options for two retirement plans.

2.　　These duties of prudence and loyalty are "the highest known to the law" and require plan fiduciaries to keep "an eye single to the interests of the [ERISA] participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271-72 n.8 (2d Cir. 1982). By

breaching these duties, Prisma Health caused millions of dollars in losses to its employees' retirement accounts.

3.     ERISA incorporates these duties throughout its text, treating employee retirement plans as though they were common law trusts. And it imposes these trustee-like duties on any plan fiduciary, defining as a fiduciary any entity to the extent it "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A).

4.     Defendant Prisma Health is an ERISA fiduciary because it exercises discretionary authority and control over two defined contribution retirement plans: the Prisma Health 401(a) Plan (the "401(a) Plan" or the "Plan")) and the Prisma Health Retirement Savings Plan (the "403(b) Plan") (collectively, the "Plans"). Both Plans are administered by Prisma Health's Defined Contribution Retirement Plans Administrative Committee of Prisma Health and Affiliate Organizations (the "Committee"). The Committee employed the same flawed process for both Plans, causing many of the same imprudent assets to appear in each Plan.

5.     As defined contribution plans, these 401(a) and 403(b) Plans are structured like the more widely-known 401(k) plans. Such plans provide no guaranteed return at the time of retirement, instead requiring employees to bear the risk of loss in the market.

6.     Defined contribution plans are typically set up so the employer (as plan fiduciary) crafts a menu of investments from which the employees (the plan participants) may

2

choose. "Although the defined contribution scheme allocates some power to participants, a fiduciary's menu construction is still important because poor menu construction 'leads to predictably worse outcomes for investors.'" *Stegemann v. Gannett Co., Inc.,* 970 F.3d 465, 469 n.3 (4th Cir. 2020) (quoting Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans,* 124 Yale L. J. 1476, 1507 (2015)).

7.　　　As detailed below, Prisma Health cobbled together bad investment menus for both Plans. Both Plan menus reflect a haphazard process for selecting and retaining investments. More troublingly, Prisma Health's choices suggest a focus on providing excess compensation for plan recordkeepers instead of prioritizing the best interests of plan participants.

8.　　　Plaintiff Michele Becerra is a participant in Prisma Health's 401(a) Plan and has been a participant in the 403(b) Plan. Like many other Prisma Health employees, Becerra was harmed by Prisma Health's selection of high cost, low performance investment options.

9.　　　Becerra's quarterly account statements confirm her investments in the challenged funds and other mutual funds offered through the Plan's investment menu administered by Empower.

10.　　　Through its imprudent and disloyal process, Prisma Health inflicted harm on Becerra and other participants in the Plans who invested in the mutual funds challenged below ("Class Members") in several ways. The specific harms include:

- **Prudence**: Selecting and retaining higher-cost share "retail" classes of mutual funds instead of lower-cost "institutional" shares of the same funds. This form of imprudence manifested in Prisma Health's selection of higher-priced "Class A" shares of the Clearbridge Large Cap Growth Fund ("Clearbridge"), the Western Asset Core Bond Fund ("Western"), Putnam Large Cap Value Fund ("Putnam"), Allspring Mid-Cap Value Fund, Allspring Special Mid-Cap Value Fund, PIMCO Income Fund, and PIMCO Real Return Fund. Each of these funds made cheaper share classes available to institutional plans, but Prisma Health chose more expensive options that provided no additional benefit to plan participants.

- **Loyalty**: Choosing retail shares of mutual funds that kicked back excessive revenue-sharing fees to the Plans' recordkeeper, Empower Retirement, LLC ("Empower"), while causing plan participants to bear unnecessary costs.

- **Prudence**: Failing to evaluate returns and risks against meaningful benchmarks and peers with similar aims and characteristics. This sloppy process led Prisma Health to select and retain mutual funds with abysmal risk/return profiles under basic metrics (e.g., sub-par Information Ratios, Sharpe Ratios, peer comparisons, and Morningstar ratings). This common breach of duty infected Prisma Health's selection and retention of the Clearbridge, Western, and the John Hancock Bond Fund.

11.     By failing to evaluate whether the Committee's strategies for choosing expensive managed investments had any reasonable prospect of paying off for plan participants, Prisma Health crafted an investment menu that teemed with uncompensated risk of volatility and loss. These "uncompensated" risks are "bad risks—ones in which there is

4

unwarranted danger of loss, or volatility that is not compensated by commensurate opportunities for gain." Restatement (Third) of Trusts § 90 (2007).

12.     Plaintiff has standing to bring this action because she participated in both Plans during the Class Period and suffered financial injury as a result of Prisma Health's conduct. Plaintiff and Class Members are entitled to recover losses to the Plan, including the difference between the value of their accounts as they exist today, or as of the date of distribution, and the value those accounts would have had absent Prisma Health's breaches of duty.

13.     Plaintiff's quarterly account statements confirm that she incurred ongoing losses due to the imprudent investment options and excessive fees charged by the Plans. For example, Plaintiff's statements document fees including "Plan Administration Participant Account Fee[s]" and "Investment Option Service Fee[s]" deducted from her account, as well as diminished returns resulting from the challenged investment options.

## JURISDICTION AND VENUE

14.     Plaintiff brings this action under 29 U.S.C. §§ 1132(a)(2), (3). These sections allow plan participants to sue on behalf ERISA plans to remedy breaches of duty and to obtain appropriate equitable and monetary relief under 29 U.S.C. § 1109.

5

15. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because this case presents a federal question arising under ERISA.

16. Under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b), venue is proper because Prisma Health maintains its principal place of business in this district and regularly conduct business in this district. Among other things, this district is where Prisma Health carried out the acts and practices that give rise to this case.

## PARTIES

### *Plaintiff, Class Members, and Defendant*

17. Plaintiff is a citizen and resident of New Mexico and is a participant in both Plans. At all relevant times, Plaintiff held investments in the Plans that were offered and subject to the investment decisions, oversight, and processes of the Plans' fiduciaries.

18. The Class Members consist of other plan participants in the 401(a) and 403(b) Plans who, during the Class Period, held any of the challenged mutual fund investment options described below.

19. Prisma Health is a non-profit South Carolina corporation with a principal office located at 701 Grove Road, Greenville, SC 29605, and is a citizen of the State of South Carolina

20. Prisma Health was formed through the merger of Greenville Health System and Palmetto Health, which was completed in November 2017. The merged organization

6

initially operated as "SC Health Company" before rebranding as Prisma Health in early 2019.

21.    Prisma Health is now the largest healthcare provider in South Carolina, operating more than eighteen hospitals and hundreds of physician practice sites across the Upstate and Midlands regions.[1]

22.    Prisma Health retains control over its employees, Board, departments, agents, and vendors who perform fiduciary functions in response to the Plan, including the power to appoint or terminate, determine levels of compensation and vendors.

23.    Prisma Health is the "plan sponsor" of the Plans under 29 U.S.C. § 1002(16)(B).

24.    The Plans are "employee pension benefit plans," 29 U.S.C. § 1002(2)(A), and "defined contribution plans," 29 U.S.C. § 1002(34).

25.    As stated above, the Plans are administered by the Committee. Upon information and belief, Plaintiff alleges that the Committee consists of Matt Elsey, Mark O'Halla, Alexander Gladney, and Melvin Dixon.

26.    The Committee is responsible for selecting, monitoring, and removing investment options for the Plans. The Committee's Investment Policy Statement ("IPS") establishes criteria for monitoring investment options at least annually. As explained below, the Committee ignored these criteria and failed to act on warning signs that investments were underperforming.

---

[1] https://www.thestate.com/news/local/article156364674.html (last visited February 6, 2026).

*The Plans*

27.    The information herein regarding the Plan is based on information obtained from recent independent audits and Form 5500 filings submitted by the Prisma Health Plans to the U.S. Departments of Treasury and Labor, available at www.efast.dol.gov.

28.    The 401(a) Plan is a non-401(k) defined contribution profit-sharing plan without employee elective deferrals. According to the Plan's Summary Annual Report for 2024, the Plan holds approximately $938,584,818 in assets and has 38,606 total participants.

29.    The 403(b) Plan is a non-401(k) defined contribution plan. As of 2024, it held $2,165,121,786 in assets and included 42,504 total participants.

30.    As explained above, the Plans are defined contribution plans in which the plan sponsor, Prisma Health, is responsible for creating a menu of investments options for participants.

31.    Prior to on or about April 1, 2022, the recordkeeper for the Plan was Prudential Financial, Inc., the parent of Prudential Bank & Trust, FSB ("Prudential").

32.    On April 1, 2022, Empower Annuity Insurance Company of America—formerly known as Great-West Life & Annuity Insurance Company and the parent of Empower Retirement, LLC ("Empower")—acquired the full-service retirement business of Prudential.

33.    All assets of the Plan were transferred from Prudential to Empower on October 20, 2023. Empower is the current recordkeeper of the Plans.

8

34.     According to the Summary Plan Description ("SDP"), the Plan is intended to comply with Section 404(c) of ERISA. The SDP admits that "fiduciaries" of the Plan, like Prisma Health, have a duty to act "prudently and in the interest of you and other Plan participants and beneficiaries."

## LEGAL BACKGROUND

35.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Prisma Health as a fiduciary of the Plans. These duties are "derived from the common law of trusts." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). So, "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.*

36.     The duty of prudence appears, among other places, in the following statutory text:

A fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

   A. for the exclusive purpose of:

      i. providing benefits to participants and their beneficiaries; and

      ii. defraying reasonable expenses of administering the plan;

   B. with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

   C. by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

   D. in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

29 U.S.C. § 1104(a)(1).

37.     ERISA similarly imports the trust law duty of loyalty by stating that fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

38.     To supplement the duty of loyalty, ERISA prohibits certain transactions between the plan and any party-in-interest:

Except as provided in section 1108 of this title:

> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> > (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
> >
> > (B) lending of money or other extension of credit between the plan and a party in interest;
> >
> > (C) furnishing of goods, services, or facilities between the plan and a party in interest;
> >
> > (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]

29 U.S.C. § 1106(a).

39.     These duties apply to all of Prisma Health's discretionary actions, including its selection of the investment menu for Plan participants.

## FACTUAL ALLEGATIONS

40.     Plan fiduciaries ordinarily attempt to memorialize their investment selection and retention processes through an IPS. Depending on how it is structured, an IPS may reflect a prudent or imprudent process.

41.    All Plan investments for the Prisma Health 401(a) and 403(b) Plans were managed by a single Committee guided by a single IPS. Prisma Health's IPS establishes criteria for monitoring investment options, including performance versus benchmarks, risk measures, Sharpe Ratios, Information Ratios, and expense ratios. Despite establishing these monitoring criteria, the Committee failed to apply them prudently and appears to have ignored these factors.

42.    During the Class Period, the Committee engaged in three different categories of actions that breached the duties of prudence and/or loyalty, evidencing a flawed process for selecting and retaining investments:

- **Prudence**: Choosing higher-cost share Class A classes of mutual funds—the same class available to ordinary retail investors—instead of the same mutual funds' offering of lower-cost share classes, available only to institutional plans  (selecting Class A shares of Clearbridge, Western Asset Core, Putnam, Allspring Mid-Cap, Allspring Special Mid-Cap, PIMCO Income, and PIMCO Real Return).

- **Loyalty**: Choosing retail shares of mutual funds that kicked back fees to the Plans' recordkeeper, Empower, that bore no reasonable relation to its recordkeeping services but were instead paid based on Empower's role in getting the Plans to invest in these funds (selecting Class A shares of Clearbridge, Western, Putnam, Allspring Mid-Cap, Allspring Special Mid-Cap, PIMCO Income, and PIMCO Real Return).

11

- **Prudence**: Failing to evaluate returns and risks against meaningful benchmarks and peers, resulting in the selection of severely under-performing options (Clearbridge, Western, John Hancock).

43. Plaintiff is an adequate class representative as she invested in funds impacted by each breach of duty described above. Plaintiff's quarterly account statements from Empower confirm that during the Class Period, Plaintiff invested in at least the following funds within the Plans:

- Clearbridge Large Cap Growth – Class A.
- Western Asset Core Plus Bond – Class A.
- John Hancock Bond Fund – Class R6.[2]
- Putnam Equity Income – Class A.
- Allspring Special Mid Cap Value - Class A.

44. To review past actions, Plaintiff, through counsel, examined Prisma Health's Annual Return/Report of Employee Benefit Plan (Form 5500) for the Prisma Health 401(a) Plan filed with the U.S. Departments of Treasury and Labor for 2020.

A. **Prisma Health Violates its Duties of Prudence and Loyalty by Choosing More Expensive Class A Shares of the Putnam, Clearbridge, Western, Allspring, and PIMCO Funds.**

45. Before identifying examples of Prisma Health's imprudence in selecting costlier mutual fund share classes, this section provides background on the topic.

46. In administering a large ERISA plan, every prudent fiduciary understands that "[s]ome mutual funds offer investors different types of shares, known as 'classes.' Each

---

[2] For the John Hancock Bond Fund, Plaintiff does not challenge the selection of the share class, but only the broader decision to include this mutual fund at all.

class invests in the same portfolio of securities and has the same investment objectives and policies. But each class has different shareholder services and/or distribution arrangements, with different fees and expenses. Because of the different fees and expenses, each class will likely have different performance results."[3]

47.     At bottom, a mutual fund's share classes are simply slices of the same mutual fund pie, but some slices cost more than others. This is because large institutional investors, like the Prisma Health 401(a) and 403(b) Plans, are offered bulk discounts in the form of "institutional" share classes with lower per-unit costs.

48.     "This means that owning a different class of the same fund will result in different investment returns. The effect of different fees on different mutual fund share classes is compounded over time. * * * The more fees you pay, the less money is invested in the mutual fund share class and the less you will earn – now and over time."[4]

49.     Absent unusual circumstances—none of which are evident here—it is grossly imprudent for a fiduciary to select higher cost shares of a mutual fund when lower cost shares of the same fund are available. *See Tibble v. Edison Int'l*, No. 07-cv-5359, 2017 WL 3523737, at *12 (C.D. Cal. Aug. 16, 2017) ("[N]o prudent fiduciary would purposefully invest in higher cost retail shares . . . . [A] prudent fiduciary would have invested in the lower-cost institutional-class shares.").

---

[3] https://www.investor.gov/introduction-investing/investing-basics/glossary/mutual-fund-classes.

[4] https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-61.

13

50.    Here, Prisma Health's investment menu steered Plaintiff and Class Members towards high cost, retail level Class A shares of various mutual funds, including the Clearbridge, Western, Putnam, Allspring Mid-Cap, Allspring Special Mid-Cap, PIMCO Income, and PIMCO Real Return Funds. Lowest cost shares of each fund were available to the Plans, but Prisma Health opted to weigh down its employees' retirement savings with the more expensive Class A shares.

51.    This Complaint thus raises a "class share claim" against Prisma Health. "A 'retail class share' claim asserts that fiduciaries offered plan participants higher-cost retail-class investment options . . . when otherwise identical lower-cost institution-class products were available." Lauren K. Valastro, *How Misapplying Twombly Erodes Retirement Funds*, 32 Geo. Mason L. Rev. 421, 458–59 (2025). This form of "malfeasance" involves "the fiduciary needlessly elect[ing] to pay more for the same product when a lower bulk price was available." *Id.* By analogy, "it would be difficult to assert that a consumer with sufficient funds to buy either a twelve-ounce box of cereal at $0.30 per ounce or a twenty-ounce box at $0.23 per ounce acts reasonably in paying more per ounce." *Id.*

52.    By making this reckless choice, Prisma Health caused a deterioration in Class Members' investment returns that compounded (and continues to compound) over time. "[J]ust as compounding can dramatically increase the value of a mutual fund investment over time, so the costs of that investment can dramatically eat into that investment over time. . . . In one year, a one percent management fee would reduce a 5% increase in a

14

fund to 4%, and it would increase a 5% loss in a fund to 6%." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1163 (6th Cir. 2022).

53.    These breaches of prudence are worsened because Prisma Health also acted disloyally, choosing higher prices shares to channel kickback fees to the Plans' recordkeeper, Empower.

54.    While the more expensive retail Class A shares provided no benefit to plan participants, they allowed the Plans' recordkeeper, Empower, to reap the benefit of kickback fees from the mutual funds. The practice of these mutual funds (Putnam, Western, Clearbridge, Allspring, and PIMCO) is to pay such fees to the entity (here, Empower) credited with getting the Plan to invest in retail class shares of the funds.

55.    According to the funds' SEC prospectuses at www.sec.gov/edgar, several of these retail class funds pay revenue-sharing fees, or 12b-1 fees, to Empower, the Plan's recordkeeper.   In this arrangement, "mutual funds may share a portion of their revenues with retirement plan recordkeepers[.]" *Revenue Sharing - Dealing With This Hidden Cost of 401(k) Plan Administration*, 11/12/2001 RIA-PBW, at 6.

56.    Perhaps the most common revenue-sharing fee is the 12b-1 fee. "A 12b-1 fee, named after a section of the Investment Company Act of 1940, is an annual marketing or distribution fee that mutual funds charge. This fee is part of the expense ratio and can range from 0.25% to 1% of the fund's net assets. . . .   12b-1 fees have come under fire over the years. After all, marketing the fund to new investors does little to enhance a fund's performance, and with total mutual fund assets in the U.S. topping $20 trillion,

funds don't need to attract investors nearly as much as when Rule 12b-1 was passed." https://www.investopedia.com/terms/1/12b-1fees.asp (last visited Mar. 1, 2026). These days, "the bulk of the [12b-1 fee] money goes to commissions for brokers who sell shares in the fund to other investors." *Id.*

57.     These revenue-sharing payments constituted indirect compensation to Empower (and possibly other intermediaries) on top of Empower's direct recordkeeping and administrative fees. Between the direct and indirect fees, Empower collected "recordkeeping" fees that far exceed the reasonable value for such services.

58.     Indeed, recordkeeping for ERISA plans has become a highly automated, digitized, and commodified industry. Due to the automated computer systems used for recordkeeping, recordkeepers primarily distinguish themselves on the basis of price rather than any special or unique benefits to plan participants.

59.     "Scholars have investigated fees in various investment contexts and have yet to consistently identify any benefit derived from higher service fees. Instead, the literature shows that higher fees correspond to decreased earnings and diminished savings . . . . Plan participants thus do not 'get what they pay for' in any meaningful sense when it comes to paying higher fees. . . . Just as increased fees do not correlate to enhanced or improved services, they also do not correspond to value creation for 401(k) plan participants or reflect more work by the recordkeeper (again, with digital recordkeeping technology, services are automated)." Valastro, *Misapplying Twombly*, at 434–36.

60.     Other research shows that funds with high fees on average perform worse than less expensive funds, even on a pre-fee-basis. Ayres & Curtis, *Beyond Diversification*, 124 Yale L.J. 1476, at 1488; Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 883 (2008).

61.     Studies thus confirm that "the most consistent predictor of a fund's return to investors is the fund's expense ratio." Jill E. Fisch, Rethinking the Regulation of Securities Intermediaries, 158 U. PA. L. REV. 1961, 1993 (2010).

62.     Due to the "Class A" retail shares of mutual funds selected, the Plans' recordkeeper, Empower, received much more than a reasonable amount of compensation per participant.

63.     While Empower got to collect kickback fees it would not have received from less expensive share classes, participants suffered diminished earnings from these added fees. "Like all fees, the 12b-1 fee can have a significant impact on investment returns. A 12b-1 fee of just 0.75% can cost an investor $35,000 in lost returns on a $100,000 investment that returns 5% annually over 20 years." https://www.investopedia.com/terms/1/12b-1fees.asp.

64.     In sum, Prisma Health breached its duties of prudence by pushing participants into more expensive Class A shares when less expensive shares classes were available. And because this decision resulted in unreasonable fees being kicked back to Empower,

Prisma Health violated its duty of loyalty. Each specific example of this common failure is detailed below.

### 1.     Prisma Health chooses more expensive Class A shares of Putnam.

65.     During the Class Period, Plaintiff purchased Class A shares of the Putnam Large Cap Value Fund, one of the largest investments, as measured by assets, in the 401(a) Plan. Due to Prisma Health's poor decision-making process, only Class A shares were available to Plaintiff and other Class Members.

66.     The extra costs of the more expensive share class cause (1) increased volatility of the decreased net asset values (NAVs) due to the additional revenue-sharing costs A share class participants must bear, (2) decreased returns for A class participants, and (3) consistently lower yields, as shown in the table below.

*Table 1: Harm to Plaintiff and participants from use of Putnam Class A shares*

| Name | Average Yield 12-Month (2020 to 2-025) |
|---|---|
| Putnam Large Cap Value A | 1.30 |
| Putnam Large Cap Value R6 | 1.61 |

67.     The yields in the table above are paid monthly (1/12th each month), allowing them to compound over time. Mathematically, the lost compounding effect from these additional up-front fees are substantial, as illustrated in the table below.

*Table 2: Demonstration of the impact of lost compounding for Putnam A class*

| Prospectus Data as of 12/31/25 | Expense Ratio | 5-yr, per yr | 10-yr, per yr |
|---|---|---|---|

| | | | |
|---|---|---|---|
| *Putnam Large Cap Value A* | 0.88 | 20.53 | 24.43 |
| *Putnam Large Cap Value R6* | 0.54 | 21.23 | 25.67 |
| *Difference* | *0.34* | *(0.71)* | *(1.24)* |

68.     The expense ratio for Putnam's A class is 0.34% higher (column 2) than that of the cheaper, identically managed R6. While the difference in the expense ratio between shares classes is 0.34%, the lost opportunity cost over five years is twice that amount, at 0.71% per year. Due to compounding, it rises each year and equals 1.24% per year over ten years.

69.     Page 3 of the February 28, 2025 prospectus depicts the dollar costs by share class to an investor placing $10,000 into the Putnam Large Cap Value.

*Figure 1: The prospectus demonstrates the costs for the Putnam classes, namely a "Class A" cost of $660 for one year, while the "Class R6" costs $55*

| Share class | 1 year | 3 years | 5 years | 10 years |
|---|---|---|---|---|
| Class A | $660 | $840 | $1,035 | $1,597 |
| Class C | $266 | $514 | $887 | $1,732 |
| Class C (no redemption) | $166 | $514 | $887 | $1,732 |
| Class R | $115 | $359 | $622 | $1,375 |
| Class R5 | $65 | $205 | $357 | $798 |
| Class R6 | $55 | $173 | $302 | $677 |
| Class Y | $64 | $202 | $351 | $786 |

70.     The difference in fees between the Putnam A and the cheaper R6 was 0.35% per year from 2020 to 2025. Participants' invested dollars over that period averaged $146,034,299. Thus, the wasted fees totaled $511,120.05 per year. Stated differently, but for Prisma Health's actions, participants could have had the same managers (Jaroch/DeMore), the same stocks (107), the same price-earnings ratio (20.77), and the same market cap (164485.9), and saved over $500,000 extra in their accounts each year. Prisma Health's lack of prudence and loyalty prevented that from happening.

71.     The A class and R6 Class have the same portfolio managers (Jaroch/DeMore as of 12/31/2025), the same number of holdings (107 as of 12/31/2025), and the same management company identifier (0C00004IH9), among many other elements. As the U.S. Securities and Exchange Commission (SEC) reminds us below, the only difference is the cost paid by participants (0.88% for A and 0.54% for R6). Small differences in costs can dramatically affect participants' investment growth. Using the average account balance in both plans over plan years 2020 to 2024, an investor in the A class would pay $1,008.40 more than in the cheaper, identically managed R6 class.

*Table 3: Demonstration of identical nature of fund's classes*

| Name | Management Co. ID | Manager Name | Manager Start Date | No. of Holdings | Average Price/ Earnings Ratio | Average Market Cap($millions) |
|------|-------------------|--------------|--------------------|-----------------|-------------------------------|-------------------------------|
| Putnam Large Cap Value A | 0C00004IH9 | Jaroch, DeMore | 8/29/2012 | 107 | 20.77 | 164485.9 |
| Putnam Large Cap Value R6 | 0C00004IH9 | Jaroch, DeMore | 8/29/2012 | 107 | 20.77 | 164485.9 |

72.    The A class earned a total of 2.36% less than the cheaper, identically managed R6 share class from plan year 2020 to 2025. Going as far back as the inception year of the cheaper, identically managed R6 (2013), Plaintiff noted that from 2013 to 2020, the A share class trailed each year by an average of forty four basis points for a total lag of 3.54% over the period.

73.    Because participants' wages, totaling $136,118,109, were invested at the start of 2022, participants' accounts would have been $6,639,510 larger had Prisma Health acted prudently by switching the A Class shares to R6 shares.

74.    By selecting the Putnam Class A shares over the Class R6 shares, Prisma Health violated its duty of prudence, "offer[ing] plan participants higher-cost retail-class

21

investment options . . . when otherwise identical lower-cost institution-class products were available." Valastro, *Misapplying Twombly*, at 458–59.

75.     These higher-cost Class A shares also paid excessive and unjustified revenue-sharing fees to the Plans' recordkeeper, Empower.  Prisma Health authorized the use of this money taken from participants (by choosing the more costly share class) to pay reduced share prices (NACs) resulting from these revenue-sharing fees and sent to Empower's broker-dealer. The exact compensation for Putnam and all other mutual funds is detailed in a mutual fund selling agreement that Prisma Health did not provide upon request.

76.     Page 6 of the February 28, 2025 Putnam prospectus states: "Financial intermediary compensation. If you purchase the fund through a broker/dealer or other financial intermediary (such as a bank or financial professional), the fund and its related companies may pay that intermediary for the sale of fund shares and related services. Please bear in mind that these payments may create a conflict of interest by influencing the broker/dealer or other intermediary to recommend the fund over another investment.

77.     By selecting these more expensive shares in order to channel revenue-sharing fees to Empower, Prisma Health violated its duty of loyalty to plan participants. These transactions were prohibited transactions with a party-in-interest (Empower). *See* 29 U.S.C. § 1106(a)(1).

    **2.     Prisma Health selects more expensive shares of Western Fund.**

22

78. Because all Plan investments were managed by a single Committee guided by a single investment policy, the flawed decision-making surrounding the Putnam Fund was also reflected in the Committee's selection and retention of the Western Asset Core Plus Bond.

79. Prisma Health selected the higher-cost Class A shares of this fund during the years 2022-2023.

80. During Prisma Health's Committee meeting in plan year 2021, when they chose to replace the cheaper, identically managed "IS" class with the "A" class, they could have easily used the FINRA FundAnalyzer or similar tools to ensure their decision-making was sound and reasonable, adding value to participants' accounts.

81. Because they replaced the cheaper, identically managed class, their investigation and decision-making were reckless and imprudent.

82. To illustrate the Western Fund's specific harm using participants' 403(b) Plan account balances, Plaintiff used an average participant account balance of $55,511 from Prisma Health's recent governmental reporting.

83. Changing the FINRA default balance in the Western fund A versus IS, the FINRA FundAnalyzer produced the following image (showing a ~$50K balance at 5% growth over 6 years), showing the Western Fund's A class cost $3,092.48 versus $1,603.88 for the IS class.

*Figure 2: The Western Fund's Class A shares' future value and total cost were worse than the Class IS shares.*



84.     This selection of more expensive share class harmed the participants from 2021-2024. The harm is illustrated below using FINRA's FundAnalyzer tool.

*Figure 3: Using the FINRA default settings ($10,000 balance, 5% return, over 10 years).*



85.    By selecting the Western Class A shares over the Class IS shares, Prisma Health violated its duty of prudence.

86.    These higher-cost Class A shares paid revenue-sharing fees to the Plan's recordkeeper, Empower. By selecting these more expensive shares in order to channel revenue-sharing fees to Empower, Prisma Health violated its duty of loyalty to plan participants. These transactions were prohibited transactions with a party-in-interest (Empower), in violation of 29 U.S.C. § 1106(a)(1).

87.    These higher-cost Class A shares also paid excessive and unjustified revenue-sharing fees to the Plans' recordkeeper, Empower.  Prisma Health authorized the use of this money taken from participants (by choosing the more costly share class) to pay

25

reduced share prices (NAVs) resulting from these revenue-sharing fees and sent to Empower's broker-dealer. The exact compensation for Western and all other mutual funds is detailed in a mutual fund selling agreement that Prisma Health did not provide upon request.

88.     By selecting these more expensive shares in order to channel revenue-sharing fees to Empower, Prisma Health violated its duty of loyalty to plan participants. These transactions were prohibited transactions with a party-in-interest (Empower), in violation of 29 U.S.C. § 1106(a)(1).

> **3.     Prisma Health replaces cheaper Class I shares of Clearbridge Fund with more expensive Class A shares.**

89.     Similarly, in 2022, Prisma Health replaced Class IS shares of the Clearbridge Fund with more expensive Class A shares of the same fund.

90.     All investors are urged to read a mutual fund's SEC prospectus at www.sec.gov/ edgar before investing. This is a standard practice of any reasonable fiduciary. The SEC-prospectus image shows why the A share class should never have been selected if plan fiduciaries could buy the cheapest R6 (see far right column).

*Figure 3: Clearbridge Large Cap Growth Fund Prospectus April 1, 2025*



26

**Annual fund operating expenses (%)**

(expenses that you pay each year as a percentage of the value of your investment)

|  | Class A | Class C | Class R | Class I | Class IS | Class O |
|---|---|---|---|---|---|---|
| Management fees | 0.62 | 0.62 | 0.62 | 0.62 | 0.62 | 0.62 |
| Distribution and/or service (12b-1) fees | 0.25 | 1.00 | 0.50 | None | None | None |
| Other expenses | 0.14 | 0.10 | 0.21 | 0.11 | 0.02 | 0.06 |
| Total annual fund operating expenses | 1.01 | 1.72 | 1.33 | 0.73 | 0.64 | 0.68 |

91.     Prisma Health's selection of the Class A shares over the cheaper R6 shares was unjustifiable and reflects an imprudent and/or disloyal process.

92.     By selecting the Clearbridge Class A shares over the Class R6 shares, Prisma Health violated its duty of prudence.

93.     These higher-cost Class A shares also paid excessive and unjustified revenue-sharing fees to the Plans' recordkeeper, Empower.  Prisma Health authorized the use of this money taken from participants (by choosing the more costly share class) to pay reduced share prices (NAVs) resulting from these revenue-sharing fees and sent to Empower's broker-dealer. The exact compensation for Clearbridge and all other mutual funds is detailed in a mutual fund selling agreement that Prisma Health did not provide upon request.

94.     By selecting these more expensive shares in order to channel revenue-sharing fees to Empower, Prisma Health violated its duty of loyalty to plan participants. These transactions were prohibited transactions with a party-in-interest (Empower), in violation of 29 U.S.C. § 1106(a)(1).

4.    **Prisma Health selects expensive retail shares of four mutual funds offered By Allspring and PIMCO.**

95.    Prisma Health repeated the same breach of prudence and disloyalty when it selected and retained four other mutual funds: the Allspring Mid-Cap, Allspring Special Mid-Cap, PIMCO Income, and PIMCO Real Return Funds.

96.    The 401(a) Plan held the Allspring Special Mid Cap Value fund. In 2021, the plan switched from the less expensive, higher-returning, higher-yielding, identically managed R6 (non-revenue sharing) class to the more costly and riskier A class.

97.    In the 401(a) Plan, Prisma Health exchanged $26,692,804 of participants' funds from the cheaper, identically managed Allspring R6 class to the 61% more expensive A class. This higher expense ratio of 1.13% cost participants $109,440.50 in the Prisma 401(a) Plan.

*Table 4: Prisma Health 401(a) Plan exchanged cheaper R6 Allspring shares for more costly (61%) A class*

| Plan year | Prisma Health's actions | Expense ratio/yr | Extra costs for 2022 |
|---|---|---|---|
| 2021 | Sell participant shares in the R6 class of Allspring Special Mid Cap Value | 0.70% | |
| 2022 | Use cash to buy the A class of Allspring Mid Cap Value | 1.13% | 43% difference, equals $109,441 |

*Table 5: Allspring yields to participants could have been higher in the R6 Class*

| Name and Yields | 2025 | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|---|
| Allspring Special Mid Cap Value Fund - Class A | 0.75 | 0.97 | 0.97 | 0.70 | 0.20 | 0.31 | 0.36 |

28

| *Allspring Special Mid Cap Value Fund - Class R6* | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1.10 | 1.33 | 1.31 | 1.05 | 0.55 | 0.63 | 0.75 |

98.    Prisma Health repeated the same violations of its duties of prudence and loyalty when it came to two mutual funds offered by PIMCO.

99.    In the 2021 plan year, the Prisma 401(a) Plan held the (1) PIMCO Real Return Institutional Class (i.e., an institutional class requiring a $1 million initial purchase) and (2) PIMCO Income Institutional Class. In the 2022 plan year, Prisma Health exchanged the least expensive Institutional Class for the more expensive and riskier Class A.

**Table 6: In both Plans, Prisma Health directed cheaper, identically managed R6 classes of PIMCO Real Return be exchanged for 85% more costly A classes**

| Plan year | Prisma Health's actions | Expense ratio/yr |
|---|---|---|
| 2021 | Sell participants' shares in PIMCO Real Return Instl | 0.47% |
| 2022 | Use participants' cash to buy A class shares of PIMCO Real Return | 0.87% |

**Table 7: In both Plans, Prisma Health directed PIMCO to switch from cheaper, identically managed R6 classes for 78% more costly A classes**

| Plan year | Prisma Health's actions | Expense ratio/yr |
|---|---|---|
| 2021 | Sell participants' shares in PIMCO Income Instl | 0.51% |
| 2022 | Use participants' cash to buy Class A shares of PIMCO Income | 0.91% |

100. For the 401(a) Plan, for plan years 2022-2024 (and possibly through the present), Prisma Health selected more expensive Class A shares of the PIMCO Income Fund. Lower cost Institutional Class shares were available to the Plan, but were inexplicably not selected by Prisma Health.

101. For the 401(a) Plan, for plan years 2022-2024 (and possibly through the present), Prisma Health selected more expensive Class A shares of the PIMCO Real Return Fund. Lower cost Institutional Class shares were available to the Plan, but were inexplicably not selected by Prisma Health.

102. For both Plans, for plan years 2022-2024 (and possibly through the present), Prisma Health selected more expensive Class A shares of the PIMCO International Bond Fund. Lower cost Institutional Class shares were available to the Plans.

103. In each of these instances, Prisma Health violated its duty of prudence.

104. In addition, these higher-cost Class A shares paid revenue-sharing fees to the Plans' recordkeeper, Empower. By selecting these more expensive shares that resulted in fees being shifted to Empower, Prisma Health violated its duty of loyalty to plan participants. These transactions were prohibited transactions with a party-in-interest (Empower), in violation of 29 U.S.C. § 1106(a)(1).

B. **Prisma Health chooses funds known for underperforming their peers and scoring poorly across industry risk-and-reward metrics.**

105. While Prisma Health's selection of poor share classes is its most glaring failure, another category of failure caused even larger damages. Plaintiff and Class Members

30

incurred their largest losses when Prisma Health selected and retained mutual funds that were known to lag behind their peers with similar aims and investment styles.

106. These choices reflect an ongoing pattern of Prisma Health failing to adequately monitor mutual funds by applying standard metrics for acceptable risk and return, especially when compared to costs. These risk/return metrics include index benchmarks, Morningstar ratings, Sharpe Ratios, and Information Ratios ("IR").

107. Prisma Health's IPS claims that "[i]n selecting the core investment options, the Committee shall take into account reasonable criteria including . . . [p]erformance as compared to a stated benchmark and/ or an appropriate peer group(s)," "[r]isk measures versus that of the stated benchmark and/ or peer group(s)," and "[r]isk-adjusted performance versus that of the stated benchmark and/ or peer group." It further claims "the Plan's investment options will be selected" with an eye to "[c]ontrol[ling] administrative and management costs." But Prisma Health's actions show it ignored these considerations when selecting and retaining the Clearbridge, Western, and John Hancock Funds.

108. Prisma Health's IPS also states that it will consider risk and return metrics including "Alpha," "Information Ratio," and "Sharpe Ratio." And under "Fund Expenses," the IPS claims Prisma Health will pay attention to a fund's " Expense Ratio." Despite this lip service, Prisma Health's actions prove it ignored each of these measures when choosing to retain the Clearbridge, Western, and John Hancock Funds.

109. "Alpha" measures how much value a manager adds beyond simply matching the market's returns. A mutual fund's alpha is currently positive if it beats its benchmark.

31

110. The Sharpe Ratio and IR are measures of risk relative to return, but they use different metrics. The Sharpe Ratio measures "risk-adjusted return," measuring return against an investment considered risk-free, such as U.S. Treasuries, and measuring risk by volatility, or "standard deviation" (how much the asset's price swings up and down).

111. On the other hand, IR measures how much extra return a fund consistently generates when compared with a benchmark such as the S&P 500 index. It effectively measures a fund's alpha, or excess returns compared to the index, against the volatility of those returns. The IR is often used to gauge the skill of managers of mutual funds, hedge funds, and other actively-managed funds. In this case, it measures the expected active return of the manager's portfolio divided by the amount of risk that the manager takes relative to the benchmark.

112. The difference between the Sharpe Ratio and IR is explained in the chart below, available at https://www.investopedia.com/terms/i/informationratio.asp.

## Information Ratio vs. Sharpe Ratio

| Feature | Sharpe Ratio | Information Ratio |
|---|---|---|
| Focus | Overall risk-adjusted return | Active management skill (relative to a benchmark) |
| Risk Type | Total risk (volatility) | Active risk (tracking error) |
| Benchmark | Risk-free rate (e.g., Treasury bills) | A relevant market index (e.g., S&P 500) |
| Interpretation | Higher = Better overall risk-adjusted return | Higher = Better active management skill |
| Use Case | General investment evaluation | Evaluating actively managed funds or portfolios |
| What's Good? | Depends, but greater than one is generally considered good | Depends, but greater than 0.5 is often considered good, and anything over 1.0 is excellent. |

113. Before selecting an investment menu for an ERISA plan, a prudent fiduciary would know to review an asset's Sharpe Ratio and IR. In a fiduciary account, an IR below 0.5 and a Sharpe Ratio below 1.0 are generally considered insufficient to justify inclusion. These measures are used to ensure that a fund does not add uncompensated risk to a portfolio.

114. A mutual fund's IR becomes especially important if it is an actively-managed fund. Such funds command higher costs, or "expense ratios," based on their alleged propensity to beat their benchmarks. By contrast, passive index funds charge lower fees because they merely copy their benchmarks (e.g., the S&P 500). The difference in costs between active funds and index funds can be dramatic. For 401(k) plan participants in 2021, "the average expense ratio of actively managed equity mutual funds [in such plans] fell to 0.68 percent," but "[i]ndex equity mutual fund expense ratios fell . . . to 0.06 percent[.]"[5]

115. Actively-managed funds charge these higher fees in exchange for a reasonable likelihood of consistently beating their benchmarks. If an actively-managed fund has an IR below 0.5, it is effectively charging a premium price for no consistent benefit. This is classic uncompensated risk.

116. At all relevant times, a fiduciary employing a prudent process would also have been aware that Morningstar peers predominate as the comparator in monitoring and reporting.

---

[5] https://www.ici.org/system/files/2022-03/per28-02_2.pdf (last visited 4/15/2026).

117.    Morningstar also rates assets within various Morningstar Categories on a scale of one to five stars. Each Morningstar Category seeks to group various investments into peer categories based on similar risk, return, and behavior profiles. All Morningstar star ratings are backward-looking, risk-adjusted rankings of a fund relative to other funds in its Morningstar Category. Funds are then ranked within their category on this risk-adjusted return; the top 10% get 5 stars, the next 22.5% get 4 stars, and the middle 35% get 3 stars, and so on. While Morningstar ratings have major limitations,[6] a sub-par Morningstar rating would alert a reasonable fiduciary off the need to deeply scrutinize whether a mutual fund should be replaced.

118.    Prisma Health failed this basic test, employing a reckless process that led it to select and retain the Clearbridge and Western Funds for years, and to inexplicably add the John Hancock Fund in 2024. Each of these funds consistently trailed behind their peers and benchmark indexes. And each of these funds carried a sub-par IR, Sharpe Ratio, and negative alpha despite a high expense ratio.

---

[6] For example, a Morningstar rating is measured against the Morningstar Category, not versus the broad market or its prospectus benchmark. Each Morningstar Category includes retail-class mutual funds that would not be appropriate for an institutional or fiduciary plan, so a fund may receive a high rating even if it would never be prudent in a fiduciary account. Morningstar can be biased as it defines the composition of its peer group for each fund using its own proprietary rating system (e.g., Large Blend, Intermediate Core Bond). Because of limitations in its methodology, many mutual funds with high Morningstar ratings may still be poor investments compared to peers. Plaintiff is not endorsing Morningstar ratings as a conclusive measure. Still, a sub-par Morningstar rating is such a visible negative indicator that it should trigger scrutiny and a review of alternative options.

119. Notably, Prisma Health's own IPS required the Committee to consider these very metrics—including IR, Sharpe Ratio, and expense ratios—as part of its monitoring process, yet the Committee failed to act on the red flags these metrics revealed.

120. By employing an imprudent process that failed to replace these funds with more suitable alternatives, Prisma Health hamstrung participants' returns to the tune of more than one hundred million dollars.

### 1. Clearbridge

121. Since 2020, both Plans invested in the Clearbridge Fund.

122. The Clearbridge SEC prospectus at www.sec.gov/edgar and on the corporate website shows a meaningful benchmark with similar aims, risks, rewards, and characteristics to the challenged fund, the Russell 1000 Growth TR USD (image below).

**ClearBridge**
Investments

**Dated: 09-30-2025**

**Benchmark:** Russell 1000 Growth TR USD

123. By measuring the Clearbridge Fund against this benchmark, an IR for the fund can be calculated.

124. For a prudent ERISA fiduciary constructing an investment menu, minimum acceptable IR is 0.5, meaning investors aim to earn 50% of the risk they take. For

35

example, investors risking a 3% loss would target a 1.5% return. Ideally, the IR is one percent gain for each one percent of risk. An IR of 1.0 indicates the return matches the risk undertaken.

125. At the start of the 2020 plan year, the following facts were present based on the Clearbridge prospectus benchmark (Russell 1000 Growth TR USD).

126. The Clearbridge Large-Cap Growth Fund (all classes) trailed its benchmark by 3.17% per year over the three-year period from 2018 to 2020. The Clearbridge Fund also trailed its Russell index by 2.77% per year from 2016 to 2020 (5-yr).

127. The Clearbridge Fund trailed its benchmark index by almost 1% per year (one hundred basis points) over the ten-year period from 2011 to 2020 (0.92% per year). Thus, the portfolio manager added no value, and participants paid 1.02% per year on their assets in this fund. The return versus risk financial factor, or IR, was negative 0.19 over the 2011 to 2020 period. The Clearbridge fund should have been removed in plan year 2020.

128. To a prudent fiduciary in 2020-2021, the Clearbridge Fund's failure to match its benchmark would have stood out when compared to the premium price it charged investors. For the Class A shares selected by Prisma Health, the Clearbridge Fund charged an expense ratio above 1.0%. This price far exceeded what was typical. In 2019, expense ratios for all equity mutual funds averaged 0.52 percent, and expense ratios for actively-managed funds averaged 0.74 percent.[7] By 2021, "the average expense ratio of

_____

[7] https://www.ici.org/news-release/20_news_trends (last visited 4/15/2026).

36

actively managed equity mutual funds fell to 0.68 percent," while "[i]ndex equity mutual fund expense ratios fell from 0.27 percent in 1996 to 0.06 percent in 2021."[8] Thus, the Clearbridge Fund's expense ratio exceeded the average for actively-managed equity funds by about 50%, and exceeded the average for index funds by nearly 2,000%. Plaintiff and Class Members had to bear these costs.

129.    Such an exorbitant price could only have been justified if the Clearbridge Fund had a reasonable likelihood of consistently beating its index after subtracting these excess costs. In 2020, 2021, 2022, 2023, and 2024, a prudent fiduciary would have understood that the Clearbridge Fund was not reasonably likely to meet this objective.

130.    Prisma Health's failure to consider these facts belies its IPS, which states that it will scrutinize each investment's expense ratio, IR, and alpha.

131.    By 2022, Morningstar downgraded the Clearbridge Fund to a mere three out of five stars.[9]

---

[8] https://www.ici.org/system/files/2022-03/per28-02_2.pdf (last visited 4/15/2026).

[9] Based on the Wayback Machine's 2022 screenshot from Morningstar site, *available online at*: https://web.archive.org/web/20221203115202/https://www.morningstar.com/funds/xnas/sblgx/quote (last visited 4/15/2026).



132.    This downgraded rating would have caused a prudent fiduciary to question its inclusion and examine other metrics in detail, as Prisma Health's IPS required.

133.    The same year, the Clearbridge Fund's Sharpe Ratio fell below 1.0. It has remained below 1.0 ever since.   By failing to appropriately evaluate the Clearbridge Fund's Sharpe Ratio, Prisma Health ignored its own IPS.

134.    From 2020 to 2024, participants invested an average of $185,960,179 in this fund. As a result, they paid $1,896,793 per year in excess management fees that were not productive. They could have bought the Russell 1000 Growth index mutual fund for less than ten basis points (0.07% from 2020 to 2024, 0.06% in 2025; Vanguard Russell 1000 Growth).

135.    Similar facts and circumstances later existed when Prisma Health performed its periodic evaluations of the Clearbridge fund during the plan years of 2021, 2022, 2023, and 2024. Thus, the Clearbridge fund should have been removed from the Plan in 2021, 2022, 2023, and 2024, yet it was not.

136. Given the Clearbridge portfolio manager's difficulty in matching or beating the SEC-prospectus benchmark index, common sense would require an investigation into whether to allow participants to buy an index-based fund. If Prisma Health had done that, for example, by using the Vanguard Russell 1000 Growth Index I, participants' accounts would have had an additional 103,483,261 dollars.

### 2.     Western Asset Core Bond Fund.

137. As alleged above, Prisma Health first added the Western Asset Core Plus Bond Fund to the 401(a) Plan as of September 30, 2019 and retained it until 2024.

138. In the 403(b) Plan, the Western Asset Core Plus Bond IS was on the 2021 plan year filing.

139. In the first plan year of the putative class period (2020), this fund's financial factors were easily accessible to the Committee. Over the ten years from 2011 to 2020, the Western Asset Core Plus Bond trailed its benchmark index by 0.27% per year. The risk, measured by standard deviation relative to the "appropriate broad-based securities market index," 29 C.F.R. § 2550.404a-5, was 3.5% per year over the ten years. Participants would have been better off buying the index via mutual funds designed to track the Bloomberg US Aggregate Bond TR USD Index.

140. Within the Morningstar ratings, the Western Fund's peer category is the "Intermediate Core-Plus Bond Cat. Avg." If this peer category is substituted for the index, Plaintiff found that the harm increased significantly to $15,502,829, compared with using an average peer mutual fund in the Intermediate Core-Plus Bond category.

141.    As of January 1, 2021, there were 624 mutual funds labeled as peers to the Western Fund by Morningstar that Prisma Health could have investigated. The Western Fund trailed the peer category by 0.81% per year over the ten years from 2011 to 2020. The risk (standard deviation) versus peers was 3.7% per year.   These poor numbers translate into a negative IR for this fund that would have been evident to the Committee in 2021.

142.    Despite its consistent failure to meet its benchmark, each class of the Western Fund charged plan participants an above average expense ratio. "[F]or bond mutual funds," the average expense ratio for 401(k) plan participants "fell from 0.32 percent in 2020 to 0.25 percent in 2021."[10] In 2020 and 2021, both the IS and A Class shares of the Western Fund exceeded these average costs. At the time it charged these prices, the Western Fund's ten-year history proved it had failed to yield any consistent benefit in the form of "alpha," or returns over benchmark.

143.    No later than December 2021, Morningstar reduced the Western Fund's star rating to three out of five stars. This is based on Morningstar's peer categories, which includes retail funds that would not even be appropriate for a fiduciary account.[11]

---

[10] https://www.ici.org/system/files/2022-06/per28-06.pdf (last visited 4/15/2026).

[11] https://web.archive.org/web/20220411203405/https://www.morningstar.com/funds/xnas/wacpx/quote (last visited 4/15/2026).



144.   In late 2021, this downgraded Morningstar rating would have at least caused a prudent fiduciary to review other metrics, especially its negative IR.

145.   In 2021, the Western Fund's Sharpe Ratio fell below the minimally acceptable ratio of 1.0. It has remained below 1.0 ever since. By failing to appropriately evaluate the Western Fund's Sharpe Ratio, Prisma Health ignored its own IPS.

146.   If the Committee had considered this information, it would have removed the Western Fund in 2020, 2021, 2022, or 2023.

### 3.    John Hancock.

147.   In 2024, Prisma Health removed the Western Fund and replaced it with the John Hancock Bond Fund. While this change removed the share-class problem, Prisma Health again chose an investment that any prudent fiduciary would have rejected.

148.   A quick return-versus-risk review of the John Hancock Bond fund added in 2024 follows. Plaintiff gave appropriate consideration to the relevant financial factors that affected the likelihood that the portfolio manager's $740,151.51 in compensation for plan year 2024 was earned (0.35% multiplied by the participants' assets of $211,471,861).

41

149. Looking back twenty years from plan year 2023 (the longest data set available to evaluate the portfolio manager's skill), Plaintiff found that the financial factors indicated: (1) the return-versus-risk or information ratio (IR) was not close to the desired 1.0 at 0.17. The risk was 580% higher than the return (6.97% risk versus 1.2% return).

150. If the Committee performed this evaluation, they would not have added the John Hancock Bond fund in 2024.

## CLASS ACTION ALLEGATIONS

151. Plaintiff brings this action pursuant to Rule 23 on behalf of the class of persons described herein and on behalf of the Plan. Plaintiff reserves the right to revise her class definitions and to propose other or additional classes in subsequent pleadings or in their motion for class certification, after discovery in this action.

152. Plaintiff brings this action on behalf of herself and the Class, which is defined as participants in and beneficiaries of the Plans who, within the statute of limitations period, invested in any of the challenged mutual funds (specifically, the Clearbridge Fund, Western Fund, Putnam Fund, Allspring Mid-Cap Fund, Allspring Special Mid-Cap Fund, PIMCO Income Fund, and PIMCO Real Return Fund), but excluding Prisma Health's Committee members; any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of Prisma Health or is or was a partner, officer, director, or controlling person of Prisma Health; the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of Prisma Health; Plaintiff's counsel; judges of the Court in which this case is pending and their current

42

spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

153. The Class Period is from the beginning of the applicable statute of limitations period to Plaintiff's claims through the date of judgment.

154. Plaintiff asserts the Counts against Prisma Health on behalf of the Plans and, in acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plans.

155. **Numerosity:** The Classes are so numerous that joinder of all Class members is impracticable. At all relevant times, both Plans had over 30,000 participants.

156. **Typicality:** Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff is a current or former participant in the Plans who has suffered injuries as a result of Prisma Health's mismanagement of the Plans. Prisma Health treated Plaintiff consistently with other Class members with regard to the Plans. Prisma Health managed the Plans as a single entity, in an omnibus account, and therefore Prisma Health's imprudent decisions affected all Plan participants similarly. All Class members are trust beneficiaries of the same trust and use the same custodian and recordkeeping system.

157. These mutual fund securities are not registered to or owned directly by Plan participants—unlike individual retirement accounts (IRAs). The Plans' trusts (identified as "Reliance Trust" in the Forms 5500) owns the SEC-registered securities and buys and sells them at an omnibus or net aggregate trust level, settling shares daily with the recordkeeper, which updates individual participant account balances through daily valuation.

158. Therefore, each Prisma Health Plan participant or Class Member is a beneficiary of the same trust and participates through a common trust company and a common recordkeeping firm.

159. Plaintiff's claims are typical of the claims of the Class. Plaintiff has no interests antagonistic to the Class, and questions of law and fact are common to Class members and predominate over any individualized questions. Plaintiff understands that this matter cannot be settled without Court approval.

160. **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff's interests are aligned with those of the Class, and Plaintiff has retained counsel experienced in ERISA class action litigation. Plaintiff has no conflicts of interest that would impair their ability to represent the Class.

161. Plaintiff has retained counsel with extensive experience in ERISA and trust investment management litigation, including matters with over $1 billion in trust assets at stake.

162.    **Commonality**: Common questions of law and fact predominate, including but not limited to:

   a.  Whether Prisma Health breached their duties of prudence and loyalty by failing to adequately monitor and control the Plans' administrative costs;

   b.  Whether indirect compensation or revenue-sharing payments received by Prisma Health or service providers constituted prohibited transactions under 29 U.S.C. § 1106;

   c.  Whether such compensation resulted in illegal inurement in violation of 29 U.S.C. § 1103;

   d.  Whether Prisma Health failed to prudently monitor and remove imprudent Plan investments;

   e.  Whether Plan expenses exceeded reasonable compensation;

   f.  Whether Prisma Health failed to investigate and negotiate lower-cost alternatives;

   g.  Whether Prisma Health breached its duty to properly select investments;

   h.  Whether Prisma Health breached its duty to monitor Plan investments;

   i.  The proper measure of monetary relief; and

   j.  The proper form of equitable and injunctive relief.

163.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Prisma Health would create a substantial risk of

inconsistent or varying adjudications, resulting in incompatible standards of conduct governing Prisma Health's fiduciary obligations. Absent class treatment, different courts could impose conflicting requirements on Prisma Health's management and administration of the Plan.

164.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications as to individual Class members would, as a practical matter, be dispositive of the interests of other Plan participants or would substantially impair or impede their ability to protect those interests. Any equitable relief ordered by the Court—such as the removal of imprudent Plan investments or fiduciaries—would necessarily affect the Plan as a whole. Likewise, the accounting for losses and restoration of Plan assets required under 29 U.S.C. §§ 1109 and 1132 would inure to the benefit of all participants, rendering individual actions impracticable.

165.    Class certification is further appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this action. Prisma Health's conduct, as alleged herein, was uniform and affected all Class members in the same manner.

166.    Class members have little interest in pursuing separate actions against Prisma Health because the amount of each individual claim is relatively small compared to the

expense and burden of individual litigation. Plaintiff is unaware of any similar individual actions brought by Class members asserting these claims.

167. Class certification will also avoid duplicative litigation and reduce the risk of inconsistent or conflicting judgments concerning Prisma Health's fiduciary practices.

168. Managing this action as a class action will not present any unusual or insurmountable difficulties, as the claims arise from common policies, practices, and fiduciary decisions applicable to the Plan as a whole.

169. In the interests of justice and judicial efficiency, concentrating the litigation of all Class members' claims in a single forum is both desirable and appropriate.

## COUNT I
## BREACH OF DUTY OF PRUDENCE
### (Higher Cost Share Class Selection)
### 29 U.S.C. § 1104(A)(1)(A)

170. Plaintiff incorporates by reference the allegations in paragraphs 1-169.

171. During the Class Period, Prisma Health was a fiduciary of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or control over Plan administration and assets.

172. Prisma Health breached its duty of prudence by:

a. Offering higher-cost retail share classes instead of available lower-cost institutional share classes.

b. Failing to monitor and remove these higher-cost shares and replace them with lower-cost institutional shares.

47

c. Failing to engage in a prudent and documented process for evaluating Plan fees and investments, as further described in the class certification allegations; and

d. Failing to negotiate with service providers to reduce Plan costs.

173. This common pattern of behavior led to Prisma Health's selection and retention of higher-cost Class A shares of the Clearbridge, Western, Putnam, Allspring, and PIMCO Funds described throughout this Complaint. In each instance, Prisma Health chose more expensive share classes over less expensive shares, without providing any additional benefit to plan participants.

174. Based on Forms 5500 filed from 2009 to the present, the Plans' investment lineup and fee structure reflect systemic process failures rather than isolated or reasonable fiduciary decisions.

175. Under ERISA §§ 409(a), 502(a)(2), and (a)(3) (29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3)), Prisma Health is liable to restore to the 401(a) Plan all losses caused by its breaches, disgorge any profits derived from Plan assets, and provide other appropriate relief.

176. On behalf of the Plans, Plaintiff also seeks appropriate equitable relief under ERISA § 502(a)(3), recovery of prejudgment interest, and an award of attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

## COUNT II
## PROHIBITED TRANSACTIONS WITH A PARTY-IN-INTEREST
### 29 U.S.C. § 1106(a)(1)

177. Plaintiff realleges and incorporate by reference paragraphs 1-169.

48

178.    As the Plans' recordkeeper, Empower is a party-in-interest to the Plans within the meaning of ERISA, and Prisma Health was a fiduciary during the Class Period.

179.    Prisma Health allowed the Plan to select a series of Class A mutual fund options that resulted in Empower being paid excessive indirect compensation, which must be restored to the Plan.

180.    As described above, Empower received excessive compensation through revenue-sharing arrangements with the Putnam, Clearbridge, Western Core, Allspring, and PIMCO mutual funds at issue. These revenue sharing fees included, at a minimum, excessive 12b-1 fees, and may have including other fees (e.g., sub-transfer-agent fees).

181.    Empower's excessive compensation resulted from Prisma Health's prohibited transactions, selecting Class A mutual fund shares that paid kickback fees to Empower without providing any corresponding benefit to plan participants.

182.    In violation of ERISA § 406(a) and outside the protections of ERISA § 408(b)(2), Prisma Health caused the Plans to engage in transactions involving service providers and investments that were not necessary for the operation of the Plans and that involved compensation exceeding reasonable amounts.

183.    Prisma Health knowingly caused the Plans to incur excessive revenue-sharing costs that bore no reasonable relationship to the value of services provided, constituting prohibited transactions under 29 U.S.C. § 1106(a)(1).

184.    Prisma Health knew or should have known that Empower and other service providers would receive excessive direct or indirect compensation from Plan assets, resulting in impermissible transfers of Plan assets to parties in interest.

185. As a direct and proximate result of these prohibited transactions, the Plans paid millions of dollars in excessive administrative and investment-related fees and suffered millions of dollars in losses.

186. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Prisma Health is liable to restore all losses suffered by the Plans and to disgorge all revenues received as a result of the prohibited transactions. Plaintiff also seeks appropriate equitable relief under 29 U.S.C. § 1132(a)(3).

187. Plaintiff therefore seeks all remedies available to them and to the Plans to redress these prohibited transactions.

## COUNT III
## BREACH OF DUTY OF PRUDENCE
### (Imprudent Process for Selecting and Retaining Investments)
### 29 U.S.C. § 1104(A)(1)(A)

188. Plaintiff incorporates by reference the allegations in paragraphs 1-169.

189. During the Class Period, Prisma Health was a fiduciary of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or control over Plan administration and assets.

190. Prisma Health breached its duty of prudence by failing to evaluate returns and risks against meaningful benchmarks and peers with similar aims and characteristics.

191. This inadequate fiduciary process led Prisma Health to select and retain mutual funds with abysmal risk/return profiles under basic metrics, including poor IRs, Sharpe Ratios, and Morningstar ratings.

192. This common breach of duty infected Prisma Health's selection and retention of the Clearbridge, Western, and the John Hancock Bond Funds, which trailed their peers and their respective benchmarks at all relevant times, and each carried sub-par Morningstar ratings.

193. Based on Forms 5500 filed from 2009 to the present, the Plans' investment lineup and fee structure reflect systemic process failures rather than isolated or reasonable fiduciary decisions.

194. Under ERISA §§ 409(a), 502(a)(2), and (a)(3) (29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3)), Prisma Health is liable to restore to the 401(a) Plan all losses caused by its breaches, disgorge any profits derived from Plan assets, and provide other appropriate relief.

195. On behalf of the Plans, Plaintiff also seeks appropriate equitable relief under ERISA § 502(a)(3), recovery of prejudgment interest, and an award of attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court enter judgment:

(1)     declaring that Prisma Health breached its duties as described above;

(2)     holding that Prisma Health is personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duty and prohibited

transaction, and to otherwise restore the Plans to the position it would have occupied but for the breaches;

(3)     determine the method by which plan losses and fiduciary profits should be calculated, and order Prisma Health to provide all accountings necessary to determine the amounts Prisma Health must make good to the Plan under 29 U.S.C. §1109(a);

(4)     hold that Prisma Health must disgorge all sums of money received from their use of assets of the Plans;

(5)     surcharge against Prisma Health and in favor of the Plans all amounts involved in any transactions which an accounting reveals were improper, excessive and/or in violation of ERISA;

(6)     order equitable restitution against Prisma Health;

(7)     certify the Class, appoint Plaintiff as a class representative, and appoint Plaintiff's Counsel as Lead Class Counsel;

(8)     award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

(9)     order the payment of interest to the extent it is allowed by law; and

(10)     grant other equitable or remedial relief as the Court deems appropriate.

Respectfully submitted: April 20, 2026

/s/ Kenneth E. Norsworthy, Jr.
Kenneth E. Norsworthy
Federal Bar No. 12580
Norsworthy Law, LTD CO.
16 Whitsett St
Greenville SC 29601
(864) 320-6212
ken@norsworthyfirm.com

James R. DeMay*
Bryson Harris Suciu & DeMay, PLLC
900 West Morgan Street
Raleigh, NC 27603
Phone: (704) 941-4648
jdemay@brysonpllc.com

Jimmy W. Mintz*
Bryson Harris Suciu & DeMay, PLLC
201 Sevilla Avenue, 2nd Floor
Coral Gables, FL 33134
Tel.: (786) 879-8200
jmintz@brysonpllc.com

Lee Melchionni*
LRJ Law Group, LLP
1100 H Street NW, Ste. 840
Washington, D.C. 20005
lee@lrj401k.com

*Pro Hac Vice Applications Forthcoming